Heather ZSAMBA, an individual, and a Minor by her next friend Frank and Dean Ann Zsamba, Plaintiff,

v.

COMMUNITY BANK, ABILENE, KANSAS, Defendant.

No. Civ.A. 98–4221–DES.
United States District Court,
D. Kansas.

June 14, 1999.

Brenda J. Bell, Seaton, Miller & Bell, L.L.P., Manhattan, KS, for Frank Zsamba, next friend of Heather Zsamba, an individual and a minor Heather Zsamba, Dean Ann Zsamba, next friend to Heather Zsamba, plaintiff.

Ann L. Hoover, Clutter, Hinkel & Aadalen, LLP, Topeka, KS, Timothy H. Girard, Grant M. Glenn, R. Patrick Riordan, Woner, Glenn, Reeder & Girard, for Community Bank, Abilene, Kansas, defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter comes before the court on plaintiff's Application for Injunction Pursuant to F.R.C.P. 65 (Doc. 8). A hearing on this motion was held on June 8, 1999, at which time the court took the matter under advisement.

For the reasons set forth below, plaintiff's motion is denied.

## I. BACKGROUND

Plaintiff's parents obtained a loan from Community Bank of Abilene, Kansas (hereinafter "the Bank"), on August 10, 1994, for approximately $2500 and pledged Spy Guy, the horse at issue in this case, as collateral for that loan. The loan proceeds were to be used for expenses related to their business, Zig Zag Stables. At the time that plaintiff's parents obtained the loan, they signed a security agreement which contained a future advance clause and gave the Bank a security interest in the horse. The security agreement also contained a clause which stated that plaintiff's parents were representing to the Bank that they had good and marketable title to the collateral.

On October 27, 1994, plaintiff's parents paid off the original loan and obtained a second loan to enable them to purchase a truck for their business. This second loan stated that it was secured by the original security agreement signed in August of 1994, as well as a second security agreement executed the same day as the loan, which granted the bank a security interest in the truck. The parties dispute whether plaintiff's father later requested that the horse be released as collateral because it belonged to plaintiff.

On January 2, 1998, plaintiff's parents filed for bankruptcy in Wichita under chapter 13. In the pleadings filed with the bankruptcy court, her parents claimed the horse as their property; thus, ownership of the horse apparently was not in dispute at that time. Furthermore, plaintiff's parents indicated in their bankruptcy pleadings that they were not holding property for anyone else. Plaintiff's parents also did not dispute their ownership of the horse at the hearing held before the bankruptcy court. In fact, her father indicated during the bankruptcy hearing that the

horse was only worth 60 cents on the pound for slaughter value, or approximately $1,000.

The Wichita division of the bankruptcy court granted the Bank relief from the automatic stay provision on July 22, 1998, allowing the Bank to proceed against plaintiff's parents in state court to recover the horse. The Bank then filed suit in the Dickinson County District Court, seeking an *in rem* judgment regarding the horse, and filed a motion for immediate delivery of the horse, which was set for hearing on September 1, 1998. The Wichita bankruptcy court dismissed the bankruptcy proceeding on August 26, 1998. Although the court did not invoke the 180–day bar to re-filing for bankruptcy, the bankruptcy court did grant prospective stay relief to the Bank for any future bankruptcies that plaintiff's parents might file.

On August 31, 1998, plaintiff's parents filed a second chapter 13 bankruptcy petition in Topeka. On September 1, 1998, the Dickinson County District Court held a hearing on the Bank's motion to take immediate delivery of the horse. Neither one of plaintiff's parents appeared, even though they were served notice of the hearing. Therefore, the court granted the motion, and the Bank posted a bond as required by Kansas statute, based upon the value of the horse as stated by plaintiff's father at the Wichita bankruptcy hearing. The Dickinson County Sheriff's Department executed the court's order and delivered the horse to the party who has been boarding the horse for the Bank. The horse was inspected by a veterinarian and was insured for $10,000. Apparently, during the course of executing the court's order, plaintiff's parents resisted the Sheriff's deputies and are currently awaiting trial on criminal charges as a result.

After the Bank learned of the second bankruptcy petition, the Bank filed a motion to enforce the Wichita bankruptcy court's order granting the Bank prospective stay relief. At the same time, plaintiff's parents filed a motion to have the horse returned to them based upon the theory that the horse belonged in their bankruptcy estate and stating that the horse was necessary for their reorganization. However, in the Topeka bankruptcy pleadings, plaintiff's parents listed the horse as having no value and subject to an ownership dispute with their daughter. The Topeka bankruptcy court denied the motion filed by plaintiff's parents and allowed the Bank to proceed with the state court action.

Plaintiff's parents subsequently filed a motion with the Topeka bankruptcy court seeking to redeem the horse and take possession. This motion was also denied. The second bankruptcy petition was dismissed on November 6, 1998, in response to a motion by the bankruptcy trustee. In the order of dismissal, the bankruptcy court prohibited plaintiff's parents from re-filing a bankruptcy petition for 180 days.

On September 3, 1998, plaintiff sent the Bank a letter in which she claimed ownership of the horse. The Bank states that this was the first notice it received of plaintiff's alleged interest in the horse. On September 16, 1998, the Bank amended its state court petition to foreclose its security interests in both the truck and the horse. The Bank then filed a motion for immediate delivery of the truck. The hearing on this motion was set for September 28, 1998.

Plaintiff's father appeared with counsel at the hearing, at which time the court granted the motion. Plaintiff's father voluntarily surrendered the truck the following day. However, plaintiff's parents failed to file a timely answer to the Bank's state court petition. On October 13, 1998, four days after the time to file an answer had expired, the same counsel who appeared at the hearing filed a motion seeking leave to file a late answer; however, neither the motion nor the proposed answer alleged that plaintiff had an interest in the horse.

The Bank objected to the motion to file the answer late and filed a motion for default judgment. The Dickinson County District Court entered default judgment against plaintiff's parents on November 23, 1998. The journal entry stated that the Bank had to sell the truck first, and then the Bank could sell the horse if the sale of the truck did not satisfy the debt. The time in which to appeal this order expired on December 28, 1998. Plaintiff's parents did not appeal the entry of default judgment.

On December 22, 1998, the bank sold the truck at a private sale. Plaintiff's parents subsequently objected to the commercial reasonableness of the truck sale, at which time plaintiff's parents specifically stated that the underlying indebtedness to the Bank did not fall within the scope of the Uniform Consumer Credit Code. The Dickinson County District Court conducted a hearing on the objections and found that the sale was commercially reasonable. Thus, the only remaining issues before the state court are the sale of the horse and attorney fees. Plaintiff's attorney made a "limited appearance" at the hearing on the objections to the sale of the truck and informed the state court that she wanted to receive notice of any sale of the horse.

Plaintiff filed this action under her own name on December 14, 1998, with a federal claim pursuant to the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, and state law claims for conversion and wrongful garnishment. Plaintiff's complaint requested $20,000 in damages, as well as attorney fees, costs, and punitive damages. Plaintiff then filed an Application for Injunction Pursuant to F.R.C.P. 65 (Doc. 8) on February 12, 1999.

On March 2, 1999, this court issued a Memorandum and Order giving plaintiff twenty days to amend her complaint to bring suit through her next friend or a guardian ad litem, pursuant to Fed. R.Civ.P. 17(c). In that same order, the court declined to exercise supplemental jurisdiction over plaintiff's state law claims. Thus, the only claim left in this case is plaintiff's FDCPA claim. Plaintiff filed her amended complaint on March 19, 1999.

## II. STANDARD FOR PRELIMINARY INJUNCTION

■ To obtain a preliminary injunction, the movant must establish that:

(1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits.

*Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1198 (10th Cir.1992) (quoting *Tri–State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986)). If the moving party satisfies the first three elements, the standard for meeting the fourth requirement, substantial likelihood of success on the merits, becomes more lenient. In such a case, the movant need only show "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation." *Id.* at 1199. Whether to issue a preliminary injunction is committed to the sound discretion of the trial court. *Id.* at 1198.

## III. DISCUSSION

Plaintiff's request for injunctive relief includes the following demands: (1) that the Bank be enjoined and restrained from the sale of Spy Guy until such time as this action is adjudicated on the merits; (2) that the court order that the Bank be required to post a bond with the Clerk of the District Court in the amount of $20,000; (3) if the Bank does not post the bond, that the horse be returned to the care and control of the plaintiff; (4) if the Bank retains control of the horse, then the court should order a monthly examination

by a veterinarian who specializes in horses with the same genetic disease as Spy Guy and that a monthly report, which includes a physical, farrier record, exercise and feeding record and schedule, be filed with the court; (5) that the plaintiff be allowed to visually inspect the horse at regular times and to exercise and care for the horse if the plaintiff so elects; and (6) that the court order that the horse be under blankets and receive the vitamin and coat supplements that he has received his entire life.

Plaintiff contends that the injunction should be issued because the Bank is attempting to satisfy her parents' debt with her property. Plaintiff alleges that the Bank had written notice of her interest in the horse at the time the horse was removed from her possession. Furthermore, plaintiff argues that the Bank has stated that it intends to proceed with the sale of the horse. Since plaintiff is a minor, she has insufficient funds to redeem the horse, and she asserts that the redemption option would require her to pay her parents' debt. In addition, plaintiff argues that the injury is not speculative and is imminent and that the injury will be prevented by a favorable decision.

The Bank responds that plaintiff cannot obtain injunctive relief pursuant to the FDCPA. The Bank also argues that plaintiff should not be allowed to obtain injunctive relief because she does not seek return of the horse in her complaint. Instead, plaintiff only seeks $20,000 in damages for the loss of the horse. Finally, the Bank argues that, even if the court were to consider the application for injunction on the merits, plaintiff could not obtain injunctive relief because she has failed to carry her burden of proof with respect to the first, second, and fourth elements that the court must consider before granting a preliminary injunction.

Although plaintiff could seek leave of the court to amend her complaint to request the return of the horse, the court must agree that plaintiff is not entitled to injunctive relief on a claim pursuant to the FDCPA. "[E]quitable relief is not available to an individual under the civil liability section of the [FDCPA]." *Sibley v. Fulton DeKalb Collection Serv.*, 677 F.2d 830, 834 (11th Cir.1982). *See also Ditty v. CheckRite, Ltd.*, 973 F.Supp. 1320, 1338 (D.Utah 1997) (injunctive relief not available to plaintiffs under FDCPA). The FDCPA provides, in relevant part, that the remedy for a violation of the Act is an amount equal to the sum of the following:

(1) any actual damage sustained by such person as a result of such failure [to comply with the FDCPA];

(2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; ...

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

15 U.S.C. § 1692k(a). Thus, the court could deny plaintiff's application for an injunction on this basis alone.

However, the court finds that plaintiff's application for an injunction would be denied on the merits, as well. With regard to the first element, plaintiff must show that she would suffer irreparable injury if the preliminary injunction is not issued. "Plaintiff's delay in seeking a preliminary injunction indicates that the damages plaintiff contemplates are not 'serious enough to justify a preliminary injunction.'" *Mid–States Ag–Chem Co., Inc., v. Atchison Grain Co., Inc.*, 750 F.Supp. 465, 467 (D.Kan.1990) *See Kingsford Products Co. v. Kingsfords, Inc.*, 674 F.Supp. 1428, 1431 (D.Kan.1987) (delay "undercuts the sense of urgency that ordinarily accompa-

nies a motion for preliminary relief"). Plaintiff did not file this lawsuit until approximately three months after the horse was removed from her possession. She then waited an additional two months to file her motion for a preliminary injunction. Thus, plaintiff waited five months before seeking injunctive relief, which suggests that plaintiff will not be irreparably harmed. Furthermore, as more fully discussed below, the testimony and evidence presented at the hearing indicates that money damages would be a sufficient remedy for any injury which plaintiff may suffer.

■ The second element that plaintiff must prove is the requirement that the threatened injury to her outweighs the damage the injunction would cause the opposing party. The Bank asserts that granting a preliminary injunction would merely prolong the proceedings and require the Bank to continue to pay boarding expenses, as well as insurance premiums. Much of the testimony at the hearing centered around the fact that plaintiff is a minor and has insufficient funds to replace the horse. While plaintiff testified that she did not think she would be able to find another horse with Spy Guy's personality, the court notes that there is little or no evidence before the court that there are not horses of similar breeding and potential which would be available if plaintiff had sufficient funds to replace the horse. Although the court understands plaintiff's attachment to this particular horse, that attachment, in and of itself, is not sufficient to override the injury which the Bank would suffer if the injunction were issued.

■ The third element that plaintiff must prove in order to obtain an injunction is that the injunction, if issued, would not be adverse to the public interest. Although neither party has addressed this element, the court finds that the issuance of an injunction would be adverse to the public interest. If the injunction were issued, the court would be interfering with the finality of the previous state court and bankruptcy court orders. While plaintiff claims that the horse did not belong to her parents when it was pledged as collateral, the court notes that plaintiff could have attempted to intervene in the state court proceedings before the entry of default judgment. Furthermore, plaintiff's parents could have appealed the entry of default judgment. However, neither plaintiff nor her parents chose to do so.

Finally, plaintiff must show that there is a substantial likelihood that she will eventually prevail on the merits. Because the court has found that plaintiff is not entitled to injunctive relief under the FDCPA and because the court has concluded that plaintiff would not have met her burden on the first three elements to obtain preliminary injunctive relief, it is unnecessary for the court to analyze the merits of plaintiff's case at this time.

**IT IS THEREFORE BY THE COURT ORDERED** that plaintiff's Application for Injunction Pursuant to F.R.C.P. 65 (Doc. 8) is denied.